**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTEREN DIVISION OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| DEB VINES, individually and on behalf of all others similarly situated,<br><br>     *Plaintiff*,<br><br><br>     v.<br><br>MARQUIS SOFTWARE SOLUTIONS, INC. and NORWAY SAVINGS BANK,<br><br>     *Defendant*s. | Case No.: _____<br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Deb Vines, ("Plaintiff") brings this Class Action Complaint against Defendant Marquis Software Solutions, Inc. ("Maquis") and Defendant Norway Savings Bank, ("Norway") (collectively, "Defendants") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

**PARTIES, JURISDICTION & VENUE**

1. Plaintiff Deb Vines is a citizen of the State of Maine.  Plaintiff is a customer of Norway savings whose information was compromised in the Data Breach.

2. Defendant Marquis is a technology vendor serving hundreds of banks and credit unions across the United States. Marquis is headquarters are located at 6509 Windcrest Drive, Suite 180, Plano, Texas 75024.

3.     Defendant Norway Savings Bank provides mutual banking and financial services in Maine.  Norway Savings Bank's headquarters are located at 261 Main Street, Norway, Maine 04268.

4.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from each Defendant.

5.     This Court has personal jurisdiction over Defendant Marquis because Marquis maintains its principal place and operations in Texas, because Marquis intentionally availed itself of this jurisdiction by regularly conducting business and providing employment in Texas, and because Marquis's acts and omissions giving rise to Plaintiff's and the Class's claims occurred in and emanated from Texas.

6.     Venue is proper under 28 U.S.C §1391 because a Marquis's principal place of business is located 6509 Windcrest Drive, Suite 180, Plano, Texas 75024; because Marquis intentionally availed itself of this jurisdiction by regularly conducting business and providing employment in Texas, and because Marquis's acts and omissions giving rise to Plaintiff's and the Class's claims occurred in and emanated from Texas.

## FACTUAL ALLEGATIONS

7.     Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard the personally identifiable information ("PII") of its customers, including, but not limited to names, addresses, dates of birth, Social Security numbers.

2

8.      In August 2025, Marquis experienced a cyberattack in which the PII of tens or hundreds of thousands of current or former customers of banks and credit unions that engaged Marquis- including roughly 51,000 costumers of Norway Savings Bank, nearly 7,000 customers of Community 1st Credit Union, and various CSE Federal Credit Union, among others- was compromised and exfiltrated (the "Data Breach").

9.      Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's data was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the information from those risks left the data in a dangerous condition.

10.     The Data Breach was a direct result of Defendants' failure to implement reasonable safeguards to protect PII from a foreseeable and preventable risk of unauthorized disclosure. Had Defendants implemented administrative, technical, and physical controls consistent with industry standards and best practices, it could have prevented the Data Breach.

11.     Defendants' conduct resulted in the unauthorized disclosure of Plaintiff's private information to cybercriminals. The forgoing harms are directly traceable to the Defendants' failure to adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiff.  Plaintiff suffered actual injury in the form of damages to and diminution in the value of the PII that was compromised in the Data Breach. The injuries Plaintiff suffered, as described herein, can be redressed by a favorable decision in this matter.

12.     Defendants have not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendants have modified their data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

13.     Defendants' conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The imminent risk of future harm resulting from the Data Breach is traceable to the Defendants' failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiff.

14.     Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiff's information to obtain government benefits, file fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

15.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [1] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[2]

16.     The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[1] *See*, https://www.ssa.gov/phila/ProtectingSSNs.htm.
[2] *Id.*

illegally using your Social Security number and assuming your identity can cause a lot of problems.[3]

17.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[4] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[5]

18.     Note, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

19.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[6]

20.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-

---

[3] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[4] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[5] *See* https://www.investopedia.com/terms/s/ssn.asp
[6] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384675839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

21.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[7]

22.     More specifically, the exposure to the substantial risk of future exploitation caused Plaintiff and Class Members to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiff and Class Members suffered can be redressed by a favorable decision in this matter.

---

[7] *See* https://oag.ca.gov/idtheft/facts/your-ssn

6

23.     As a result of the Data Breach, Plaintiff suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under each Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the data.

24.     In the course of their relationship, Defendant Norway collected or created PII related to Plaintiff and Class Members. By sharing that PII with Defendant Marquis, Defendant Norway was obligated to ensure the data would be safeguarded and include those data protection obligations in a business associates' agreement or other vendor contract.

25.     As such, Defendants were obligated to use reasonable technical, administrative, and physical safeguards to protect the PII in their custody.  These obligations were contained in the applicable privacy policy, contract, and other statutory privacy requirements.

26.     Plaintiff and the Class Members relied on Defendants to keep their PII confidential, securely maintained, and to make only authorized disclosures of this information.

### *Data Breaches Are Avoidable*

27.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's information was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the data from those risks left the data in a dangerous condition.

28.      Upon information and belief, the Data Breach was a direct result of the Defendants' failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to their published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of PII; and/or (iv) ensure third-party vendors were required to implement reasonable data protection measures consistent with their data protection obligations.

29.      To detect and prevent cyber-attacks, Defendant could and should have implemented administrative, physical, and technical safeguards including, but not limited to, the following:

Administrative Safeguards

   a.  Implement policies and procedures to prevent, detect, contain, and correct security violations.

   b.  Conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of PII held by the Defendant.

   c.  Implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level.

   d.  Apply appropriate sanctions against employees who fail to comply with the Defendant's security policies and procedures.

   e.  Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports.

   f.  Identify a security official who is responsible for the development and implementation of the Defendant's policies and procedures to prevent, detect, contain, and correct security violations.

   g.  Implement procedures: (i) for the authorization and/or supervision of employees who work with electronic PII or in locations where it might be accessed; (ii) to determine whether an employee's access to electronic PII is appropriate; and (iii) for terminating access to electronic protected PII when the employment of, or other arrangement with, a workforce member ends.

   h.  Implement policies and procedures that, based upon the Defendant's access authorization policies, establish, document, review, and modify a user's right of access to a workstation, transaction, program, or process.

i.   Implement a security awareness and training program for all members of Defendant's workforce, including procedures for guarding against, detecting, and reporting malicious software.

j.   Implement policies and procedures to address how the Defendant will identify and respond to suspected or known security incidents; mitigate, to the extent practicable, known harmful effects of security incidents; and document security incidents and their outcomes.

k.   Establish (and implement as needed) policies and procedures for responding to an emergency or other occurrence that damages systems that contain electronic PII.

l.   Perform a periodic technical and nontechnical evaluation in response to environmental or operational changes affecting the security of electronic PII.

m.   Contractually obtain satisfactory assurances that business associates will appropriately safeguard electronic PII.

n.   Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

o.   Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

p.   Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

## Physical Safeguards

q.   Implement policies and procedures to limit physical access to its electronic information systems and the facility or facilities in which they are housed, while ensuring that properly authorized access is allowed.

r.   Implement policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed, and the physical attributes of the surroundings of a specific workstation or class of workstation that can access electronic PII.

s.   Implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain electronic protected PII into and out of a facility, and the movement of these items within the facility.

## Technical Safeguards

t.   Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights.

u.  Implement electronic procedures that terminate an electronic session after a predetermined time of inactivity.

v.  Implement a mechanism to encrypt and decrypt electronic PII.

w.  Implement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic PII.

x.  Implement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed.

y.  Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

z.  Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

aa. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

bb. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

cc. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

dd. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

ee. Configure firewalls to block access to known malicious IP addresses.

ff.  Set anti-virus and anti-malware programs to conduct regular scans automatically.

gg. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

hh. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

ii.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

jj.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

kk. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

ll.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

mm. Execute operating system environments or specific programs in a virtualized environment.

nn.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

oo.  Conduct an annual penetration test and vulnerability assessment.

pp.  Secure your backups.[8]

qq.  Identify the computers or servers where sensitive PII is stored.

rr.  Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

ss.  Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

tt.  Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

uu.  Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

vv.  Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

ww. To detect network breaches when they occur, consider using an intrusion detection system.

xx.  Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[9]

30.      Given that Defendants collected, used, and stored PII, Defendants could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

---

[8] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (accessed June 11, 2024).
[9] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (accessed June 11, 2024).

31.    Without identifying the potential risks to the personal data in Defendants' possession, Defendants could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiff's and the Class Members' PII.

32.    Defendants knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiff and the Class Members as a result.

### *Plaintiff and Class Members Sustained Damages in the Data Breach*

33.    Plaintiff has sustained damages as a result of this Data Breach. As a further consequence of this Data Breach, Plaintiff has lost time investigating and responding to the Data Breach.

34.    Plaintiff seeks to recover all out-of-pocket losses, compensation for the time spent dealing with issues arising from the Data Breach, and at least three years of identity theft/fraud protection and spam-blocking to help detect, prevent, and/or remediate potential identity theft and fraud.

35.    The invasion of the Plaintiff and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendants' conduct. As a consequence of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

36.     Additionally, Plaintiff and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their PII was targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to each Defendant's conduct.

37.     Furthermore, Plaintiff and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to each Defendant's conduct.

38.     Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[10] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

39.     Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the categories of data typically involved in these type of data breaches, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiff

---

[10] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the data for future identity theft-related crimes or exploitation attempts.

40.     The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

41.     For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[11]

42.     As a consequence of the Data Breach, Plaintiff and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

43.     As a result of the Data Breach, Plaintiff and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and

---

[11]*See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

44.     Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[12] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[13] Sensitive PII can sell for as much as $363 per record.[14] Further, a stolen medical identity has a $50 value on the black market.[15]

45.     Furthermore, Defendants' poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. By transacting business with Plaintiff and Class Members, collecting their PII, and then permitting the unauthorized disclosure of the information, Plaintiff and Class Members were deprived of the benefit of their bargain.

46.     When agreeing to pay Defendants for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendants did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

---

[12] *Column: Shadowy data brokers make the most of their invisibility cloak,* https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[13] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/
[14] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[15] Study: Few Aware of Medical Identity Theft Risk, Claims Journal (June 14, 2012), https://www.claimsjournal.com/news/national/2012/06/14/208510.htm

47.    Through this Complaint, Plaintiff seeks redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

## CLASS ALLEGATIONS

48.    Plaintiff brings this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

49.    The Class that Plaintiff seeks to represent is defined as follows:

**Class Definition:** All individuals residing in the United States whose PII was maintained by Marquis and was compromised in the Data Breach.

**Norway Subclass:** All individuals whose PII was entrusted to Norway, was maintained by Marquis, and was compromised in the Data Breach (the "Norway Subclass," and, together with the Class, the "Classes).

50.    Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

51.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

52.    <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. The members of the Classes are so numerous that joinder of all of them is impracticable. However, the exact number of Class Members is unknown to Plaintiff at this time and such number is exclusively in the possession of

Defendants. That said, a public news report suggests the amount of impacted customers is approximately 45,000 individuals[16].

53.    <u>Commonality:</u>  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

    a.  Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

    b.  Whether Defendants had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

    c.  Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

    d.  Whether Defendant Norway required its third-party vendors to adequately safeguard the PII of Plaintiff and Class Members;

    e.  When Defendants actually learned of the Data Breach;

    f.  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

    g.  Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

    h.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    i.  Whether Defendants adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

    j.  Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of each Defendant's wrongful conduct;

    k.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

---

[16] https://wgme.com/news/local/data-breach-may-expose-person-info-of-norway-savings-bank-customers-cyber-crime-maine

54.     <u>Typicality</u>: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

55.     <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on each Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

56.     <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

57.     <u>Superiority and Manageability</u>: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually

afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

58.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

59.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

60.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

61.    Unless a Class-wide injunction is issued, Defendants may continue in the failure to properly secure the PII of Classes, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

62.     Further, Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

63.     Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendants owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, sharing, storing, and safeguarding their PII;
    b.  Whether Defendants' security measures to protect its network were reasonable in light of industry best practices;
    c.  Whether Defendants' failure to institute adequate data protection measures amounted to negligence;
    d.  Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII;
    **e.**  Whether Defendants made false representations about their data privacy practices and commitment to the security and confidentiality of personal information.

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE/WANTONNESS
### (Against All Defendants)

64.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

65.     Norway knowingly collected, acquired, stored, and/or maintained Plaintiff's and the Class members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting the PII from being disclosed, compromised, lost, stolen, or misused by unauthorized parties.

66.     Plaintiff and Class Members entrusted Defendant Norway with their PII with the understanding that Defendant would adequately safeguard their information.

67.     Defendant Norway had full knowledge of the types of PII it collected and the types of harm that Plaintiff and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

68.     By collecting, storing, sharing, and using the Plaintiff and Class Members' PII, Defendant Norway assumed a duty to use reasonable means to safeguard the PII it obtained.

69.     Defendant Norway's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors, like Defendant Marquis, to adhere to the requirements of Defendant Norway's privacy policy; (iii) complied with applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant Marquis' data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

70.     Defendants also had a duty under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce. Deceptive practices, as interpreted by the FTC, include failing to adhere to a company's own published privacy policies.

71.     Defendants violated Section 5 of the FTC Act by failing to adhere to its own privacy policy regarding the confidentiality and security of Plaintiff and Class Members information. Defendants further violated Section 5 of the FTC Act, and other state consumer protection statutes by failing to use reasonable measures to protect PII.

72.     Defendants breached its duties and thus was negligent/wanton. The specific negligent/wanton acts and omissions committed by Defendants includes, but are not limited to, the following:

      a.   Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of customer information.

      b.   Failing to design and implement safeguards to control the risks identified through the risk assessment.

      c.   Failing to encrypt personally identifying information in transit and at rest.

      d.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

      a.   Failing to adequately oversee its vendors with access to PII.

      b.   Allowing unauthorized access to PII.

      c.   Failing to detect in a timely manner that PII had been compromised.

      d.   Failing to destroy or delete PII it was no longer required to retain.

      e.   Failing to certify that its vendors deleted PII they were no longer required to retain.

      f.   Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

      g.   Failing to implement data security practices consistent with Defendant's published privacy policies.

73.     Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statues were intended to guard against.

74.     The injuries resulting to Plaintiff and the Classes because of Defendants' failure to use adequate security measures was reasonably foreseeable.

75.     Plaintiff and the Classes were the foreseeable victims of a data breach. Defendants knew or should have known of the inherent risks in collecting and storing PII and the critical importance of protecting that data.

76.    Plaintiff and the Classes had no ability to protect the PII in Defendants' possession. Defendants were in the best position to protect against the harms suffered by Plaintiff and the Classes as a result of the Data Breach.

77.    But for Defendants' breach of duties owed to Plaintiff and the Classes, their PII would not have been compromised. There is a close causal connection between Defendants' failure to implement reasonable security measures to protect the PII of Plaintiff and the Classes and the harm, or risk of imminent harm, suffered by Plaintiff and the Classes.

78.    As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including cancelled or rescheduled medical procedures and appointments; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

79.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

80.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

**COUNT 2: BREACH OF IMPLIED CONTRACT**
**(against Defendant Norway on Behalf of the Norway Subclass)**

81.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

82.     Defendant creates or collects PII in the ordinary course of providing products or services.

83.     Defendant established a privacy policy to govern how Defendant collects, uses, shares, and protects the information Defendant gathers in connection with the provision of healthcare services.

84.     In so doing, Plaintiff and Norway Subclass members entered implied contracts with Defendant by which Defendant agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

85.     Plaintiff and Norway Subclass members would not have entrusted their PII to Defendant in the absence of an expressed or implied promise to implement reasonable data protection measures.

86.     Plaintiff and Norway Subclass members fully and adequately performed their obligations under the implied contract with Defendant.

87.     Defendant breached the implied contract with Plaintiff and Norway Subclass members which arose from the course of conduct between the parties, as well as disclosures on the Defendant's web site, privacy policy, and in other documents, all of which created a reasonable expectation that the personal information Defendant collected would be adequately protected and that the Defendant would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

88.     As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiff and Norway Subclass members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

89.     Plaintiff and Norway Subclass members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

## COUNT 3: UNJUST ENRICHMENT
### (against Defendant Norway on Behalf of the Norway Subclass)

90.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

91.     Plaintiff brings this Count in the alternative to the breach of implied contract count above.

92.     Plaintiff and Norway Subclass members conferred a benefit on Norway with their money and data.  Specifically, they engaged in banking services with Norway and in doing so also provided Norway with their PII.  In exchange, Plaintiff and Norway Subclass members should have had their PII protected with adequate data security.

93.     By collecting the PII, Defendant was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiff and Norway Subclass members if their data had been compromised or stolen.

94.     Defendant failed to secure Plaintiff's and Norway Subclass member's PII and, therefore, it would be unjust for Defendant to retain any of the benefits that Plaintiff and Norway Subclass members conferred upon Defendant without paying value in return.

95.     As a direct and proximate result of the Defendant's conduct, Plaintiff and Norway Subclass members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

96.     Plaintiff and Norway Subclass members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Classes and counsel for Plaintiff(s) as Class Counsel;

B.    For an order declaring the Defendants' conduct violates the statues and causes of action referenced herein;

C.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

D.    Ordering Defendants to pay for adequate credit monitoring and dark web scanning services for Plaintiff and the Classes;

E.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F.    For prejudgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendants' conduct;

H.    For injunctive relief as pleaded or as the Court may deem proper; and

I.    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J.    Such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: December 3, 2025.          Respectfully Submitted,

/s/ Rusty M. Messer
Rusty M. Messer
BIG RIVER TRIAL ATTORNEYS
4626 Sherwood Common Blvd.
Suite 302
Baton Rouge, Louisiana
Telephone: (225) 384-6760
Fax: (225) 384-6762
Email: rusty@bigriverlaw.com

-AND-

27

Paul J. Doolittle, Esq. (*Pro Hac Vice*
Forthcoming)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
Email: pauldoolittle@poulinwilley.com
cmad@poulinwilley.com

*Attorneys for Plaintiff*